U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED | Apr 30 2026

cf

CAROL L. MICHEL
CLERK                    EDSS

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| WENDY WILLIAMS DUPONT | CIVIL ACTION NO. 24-02775 |
| Plaintiff | SECTION "N" (2) |
| VERSUS | JUDGE: ANNA M. ST. JOHN |
| TYRIN Z. TRUONG, individually and in his official capacity as Mayor of the City of Bogalusa | MAG. JUDGE DONNA P. CURRAULT |
| Defendant | |

## FIRST AMENDED COMPLAINT

Plaintiff Wendy Williams Dupont, appearing pro se, files this First Amended Complaint pursuant to the Court's Order granting leave to amend and alleges as follows:

### I. JURISDICTION AND VENUE

1. This action arises under 42 U.S.C. § 1983 and the First Amendment to the United States Constitution.

2. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3. Venue is proper in this District because the events giving rise to these claims occurred in Bogalusa, Louisiana, within the Eastern District of Louisiana.

### II. PARTIES

4. Plaintiff Wendy Williams Dupont is a resident of Bogalusa, located in Washington Parish, Louisiana.

5. Plaintiff is the founder and Executive Director (ED) of Bogalusa Rebirth, a nonprofit organization engaged in affordable housing development, blight eradication, community development, homebuyer counseling and assistance, and neighborhood revitalization within the City of Bogalusa. The Plaintiff has served as the corporation's ED since its formation in 2007.

6. Bogalusa Rebirth is not named as a plaintiff in this amended complaint. References to Bogalusa Rebirth are included because Defendant's retaliatory conduct was directed at Plaintiff personally and also at Plaintiff through her employer and work.

7. Defendant Tyrin Z. Truong is the Mayor of the City of Bogalusa and is sued in his individual and official capacities.

8. At all relevant times, Defendant acted under color of state law.

### III. FACTUAL ALLEGATIONS

**A. Plaintiff's Protected Speech and Cooperative Relationship Before the Retaliation**

1

9. Before Plaintiff's protected speech, Plaintiff and Defendant maintained a cooperative public and professional relationship. This cooperative relationship establishes the absence of prior conflict and provides context for the abrupt change in Defendant's conduct following Plaintiff's protected speech.

10. On January 7, 2023, Plaintiff attended Defendant's inauguration ceremony, parade, and inaugural ball. *See attached Exhibit A.*

11. On March 31, 2023, Plaintiff attended an event hosted by Defendant and was presenting a Certificate of Appreciation from the defendant and recognition at the Women's tea & leadership breakfast. *See Exhibit B.*

12. On May 6, 2023, Plaintiff attended the Mayor's Brunch and took photos with the Mayor. *See Exhibit C*

13. On or about May 16, 2023, Plaintiff and Defendant were publicly associated as partnering on blight-removal efforts, and Defendant shared Bogalusa Rebirth's blight-related work on social media. *See Exhibit D*

14. On or about May 20, 2023, photographs were sent to Plaintiff from a concerned citizen depicting what appeared to be city workers performing plumbing-related work at a private residence located at 618 Avenue E. Parish tax assessment records identify the property as owned by Truong Properties, with the principal owner being the Defendant's mother. *See attached Exhibit E*

15. On May 26, 2023, Plaintiff attended a scheduled private meeting with Defendant in his office to discuss concerns and showed him photos that were sent to her regarding plumbing work being performed by city workers at the private rental property owned by Defendant's mother. Partial transcript of the audio of this meeting attached as *Exhibit F1.*

16. Plaintiff did not "barge into" Defendant's office as Defendant later claimed under oath. The meeting was scheduled in advance for 3:10 p.m., as confirmed by text message communications. Audio evidence reflects that Plaintiff and her colleague, Breanna Caves, were welcomed into Defendant's office, with Defendant stating, "both of my assistants are out today." Defendant's deposition testimony characterizing Plaintiff as having "barged in" and "accosted" him is directly contradicted by this contemporaneous evidence, which instead reflects an initial conversation that included Plaintiff asking Defendant to serve as the welcome speaker at an upcoming housing fair. There is no indication of harassment, nor was Plaintiff ever told "he is busy" as he indicated in his deposition.

Additionally, Defendant asserted under oath that Plaintiff engaged in "stalking." Photographic evidence from Plaintiff's phone establishes that Plaintiff was not present or near Defendant's residence at the time of his arrest on January 7, 2023. Plaintiff avers that these statements are false, including the allegation that she was "walking her dog" in that area. Plaintiff further alleges that these statements are based on unverified information and have been repeated publicly in a manner that mischaracterizes her conduct. *See Exhibits F2–F7.*

17. During the May 26, 2023 meeting, Plaintiff attempted to resolve issues directly in a private manner with the Defendant and discussed matters including the upcoming housing fair and Long Avenue School. She expressed extreme concern for the Mayors reputation and disagreed with the activity at the private

2

residence by telling the Mayor, "the City should never be on private property performing plumbing work" and told the Mayor "that could get you in trouble". This interaction reflects Plaintiff's effort to address concerns through direct communication rather than public escalation.

18. After this meeting, Defendant stopped communicating with Plaintiff and failed to respond to text messages.

19. On June 6, 2023, Plaintiff spoke at a City Council meeting on matters of public concern, including use of public resources, public works activity, governance, transparency, and concerns about whether public resources were being used for private benefit, after the photos of work being performed at the Mayor's mother's private residence had been widely circulated online.

20. Plaintiff's June 6, 2023 City Council statement expressly stated that she was not speaking with an agenda, bias, or political motive, and that her prayer was that voicing her concerns would not incite retaliatory behavior.

21 Plaintiff's June 6, 2023 City Council remarks are attached as *Exhibit G*. This speech addressed matters of public concern, including government transparency and the use of public resources, and is protected under the First Amendment. Defendant was aware of Plaintiff's statements at the June 6, 2023 City Council meeting, and the timing of Defendant's subsequent actions occurred in close temporal proximity to this protected speech.

**B. Defendant's Facebook Page as a Public Forum**

22. Defendant maintained and used a Facebook page titled "Mayor Tyrin Z. Truong" to disseminate information related to city operations, public services, and community updates.

23. The page was routinely used to communicate public service announcements, including road closures, water outages, boil advisories, sewer updates, public safety information, and other government-related matters. All such announcements were pertinent to the public, including matters concerning health and safety. Plaintiff alleges that hundreds, if not thousands, of residents were blocked from viewing these announcements. Examples of Defendant's public-facing Facebook posts and public service announcements are attached as *Exhibits H1-H8.*

24. Defendant's Facebook page clearly functioned as a public-facing forum for communication between the Mayor and citizens. The Mayor admits in his deposition under oath that he blocked Plaintiff from the Mayor Tyrin Z Truong page, where he shares public service announcements but without identifying any legitimate basis, stating only that he was "harassed in multiple ways." Defendant's admission that he blocked Plaintiff from a page used to disseminate public service announcements confirms that Plaintiff was excluded from a forum used for governmental communication. *See attached Exhibit I*

25. Some posts were made on the City of Bogalusa page (i.e. Boil water advisory around October 28-Nov 14, 2024, also show "The City of Bogalusa limited who can comment on this posts". *See attached Exhibit J, 1-2.*

26. Defendant used the "Mayor Tyrin Z. Truong" Facebook page as a mixed-use platform for official governmental communications, political messaging, and public engagement. As shown in the deposition, Defendant acknowledged that some posts made on the page were "official" while others were not, and he did not clearly distinguish between personal, campaign, or governmental use. The page was used to

3

disseminate public service announcements affecting health, safety, and city operations, while also being used for campaign-related messaging and public interaction.

At the same time, Defendant exercised unilateral control over access to the page, including blocking Plaintiff and other citizens from viewing or engaging with content. This control directly restricted access to government information. Additionally, Defendant used the page to promote and publicize a Christmas Bike Giveaway involving items donated to the City of Bogalusa by Coastal Environmental. The bicycles were not donated for campaign purposes, yet the giveaway was promoted on Defendant's "Mayor Tyrin Z. Truong" Facebook page while citizens, including Plaintiff, had been blocked and were unable to participate or view the opportunity. The bicycles were not promoted on the official City of Bogalusa Facebook page. This activity reflects preferential access to a public-facing platform controlled by Defendant. Plaintiff includes this information to demonstrate Defendant's mixed use of the page for public, political, and personal purposes, while selectively excluding citizens from access to public-facing communications.

This combination of (1) official governmental use, (2) political and campaign-related use, and (3) selective exclusion of citizens establishes that Defendant operated the page as a public-facing forum under color of state law while engaging in viewpoint-based exclusion, following her protected speech. *See Exhibit K.*

### C. Blocking and Immediate Post-Speech Conduct

27. On June 9, 2023, just three days after Plaintiff spoke at the June 6, 2023 City Council meeting, at approximately 7:55 p.m. Defendant posted on his personal page information regarding housing development and CHDO-related requirements, including statements that there were "zero players" in the mixed-income housing space and that a seminar would be scheduled to review requirements for becoming a Community Housing Development Organization. Note: There are only 16 Community Housing Development Organizations (CHDO) in the State of Louisiana and there is generally one CHDO designation per Parish. Plaintiff alleges that this post occurred immediately following her protected speech and reflects retaliatory intent. *See Exhibit L*

28. Later that evening, on the third day after protected speech, Defendant blocked Plaintiff from both his personal page and the "Mayor Tyrin Z. Truong" Facebook page. This action occurred immediately following Plaintiff's protected speech and restricted her access to public service announcements and government communications disseminated through that page. On June 9, 2023, around 8 p.m., following the Plaintiff being blocked from both social media platforms, the Plaintiff began to see a message displayed "This content isn't available right now. When this happens, it's usually because the owner only shared it with a small group of people, changed who can see it or it's been deleted." This action occurred within days of Plaintiff's protected speech and constitutes an adverse action taken in direct response to that speech. *See Exhibit L1*

29. Upon information and belief, Defendant blocked numerous other citizens from the page while continuing to use it as a primary channel for public communication, thereby selectively excluding individuals from access to government information.

30. Prior to Plaintiff's June 6, 2023 protected speech, Plaintiff and Defendant maintained a cooperative and professional working relationship. Following Plaintiff's public comments, Defendant's conduct toward Plaintiff changed materially, including restricting access to public communications and engaging in actions that interfered with Plaintiff's work and organizational operations.

31. Following the initial act of blocking, Defendant's conduct escalated beyond social media restrictions and extended into actions affecting Plaintiff's professional activities, including efforts that interfered with Plaintiff's employer's housing development and relationships with governmental entities, and these actions were directed at Plaintiff individually.

32. The timing and sequence of these actions demonstrate a clear pattern of adverse actions taken against Plaintiff in close temporal proximity to her protected speech, supporting a causal connection between the two.

33. As a result of Defendant's actions, Plaintiff was denied access to government information, excluded from a public forum, and subjected to conduct that interfered with her professional responsibilities. Plaintiff further alleges that Defendant's retaliatory conduct followed a consistent and observable pattern in which adverse actions occurred shortly after Plaintiff experienced professional success, public recognition, or positive developments in her housing and community work. This pattern reflects temporal proximity between Plaintiff's protected activity and Defendant's conduct, as well as a broader course of behavior demonstrating retaliatory motive, escalation, and intent.

### D. Retaliatory Interference with Development Activities

34. Following Plaintiff's protected speech and removal from Defendant's Facebook page, Defendant's actions escalated to include interference with Plaintiff's housing development projects, including attempts to revoke lawfully issued building permits. These actions occurred after Plaintiff's protected speech and represent an escalation of Defendant's retaliatory conduct.

35. On or about June 27, 2023, wooded land that Plaintiff had previously identified and discussed with Defendant during a "confidential" meeting on March 23, 2023 began to be cleared using excavation equipment. During that meeting, Plaintiff informed Defendant that the property was city-owned and expressed interest in partnering with the City for development. At the time of that meeting, Defendant was not aware that the City owned the property. Within approximately 90 days of that discussion, the land was cleared without any public meeting, City Council approval, or publicly approved budget or development plan. *See Exhibit M1-2.*

36. On or about June 26, 2023, a public bid was issued for the Long Avenue Elementary School property. Plaintiff had previously discussed this property with Defendant during the May 26, 2023 meeting, including the appraised value of approximately $35,000, which was not publicly disclosed in the bid notice. *See Exhibit N1.* Complete audio from May 26 meeting will be entered as an Exhibit at trial.

37. On or about June 29, 2023, the City of Bogalusa publicly promoted the bid opportunity for the Long Avenue Elementary School property, inviting other developers to participate, despite the property being owned by the Bogalusa City School Board. The Chairman of the School Board later confirmed that the Mayor had not been authorized to intervene in or promote the bidding process. *See Exhibits N2–N3.*

5

38. Plaintiff alleges that Defendant had prior knowledge of Plaintiff's intent to pursue redevelopment of the Long Avenue Elementary School property based on discussions during May 26, 2023 meeting. The timing of the public bid promotion, following Plaintiff's protected speech and prior disclosure of project interest, supports an inference of retaliatory intent.

39. Plaintiff alleges that the timing and manner of the public bid promotion were part of a retaliatory effort to interfere with Plaintiff's development opportunities following her protected speech. The timing of these actions supports an inference that Defendant's conduct was motivated by Plaintiff's protected speech rather than independent municipal decision-making.

40. On or about July 3, 2023, after the public questioned the work being performed on Avenue F, an ordinance was introduced to the City Council "establishing the Avenue F Dog Park" on property Plaintiff had previously discussed with Defendant in confidence. *See Exhibit M3.*

41. On or about July 12, 2023, a Planning and Zoning matter involving Plaintiff's development project was denied by commissioners appointed by Defendant. Plaintiff sought a variance of approximately five feet, which, while not ultimately preventing the project, required revisions to the design. Plaintiff alleges that this denial was part of a broader effort to impair or delay her development activities.

Defendant has repeatedly asserted, both publicly and under oath, that Plaintiff's permits were "fraudulently given" and that Plaintiff was "violating city code." These assertions are contradicted by documentation demonstrating that Plaintiff's project complied with applicable zoning requirements, was properly subdivided, and received necessary approvals from relevant authorities, including Louisiana Housing Corporation and HUD-related processes.

Despite being provided with documentation confirming compliance, Defendant has continued to repeat these assertions, reflecting a pattern of willful disregard of established facts. These mischaracterizations of verified facts caused reputational harm to Plaintiff.

41.b Plaintiff further alleges that Defendant's repeated dissemination and endorsement of inaccurate and misleading information regarding environmental conditions associated with the Colonial Creosote site has directly harmed the marketability of Plaintiff's housing development projects. During his deposition, Defendant broadly asserted that "the *entire* Richardsontown is a Superfund site because it was a creosote plant." This statement is materially inaccurate. Richardsontown, a neighborhood, encompasses a large geographic area, while the designated Superfund site is confined to a defined and limited perimeter.

Available environmental review records further confirm that contamination associated with the Superfund site has been evaluated, delineated, and contained within a specific and controlled area. In addition, during a recent community meeting hosted by the Environmental Protection Agency (EPA), officials confirmed that the affected area has been secured, including the installation of fencing surrounding the designated perimeter of the site and informed attendees there was no imminent danger to the public. EPA officials further clarified that they are not affiliated with or responsible for the "Colonial Creosote: EPA Information Source" social media page referenced herein.

Such mischaracterizations, particularly when made by a public official, are misleading to the public and have the capacity to create unwarranted fear and confusion regarding environmental safety and constitute a reckless and dangerous dissemination of misinformation. Despite the existence of formal environmental review documentation confirming no significant impact and compliance with applicable federal standards, Defendant has continued to rely upon and amplify unverified third-party content suggesting the presence of contamination and undisclosed risk.

Upon information and belief, these statements have created confusion among prospective buyers, undermined consumer confidence, and interfered with Plaintiff's ability to successfully market and sell HUD compliant residential properties.

During the same period, false and misleading statements regarding Plaintiff's housing developments were further disseminated through third-party social media accounts, including anonymous profiles and pages such as "Parish Spectator" and other individuals posting under pseudonyms (Chance Mitchell) mirror Mayor's public statements. These posts included assertions that Plaintiff was selling homes at inflated prices ($200,000.) and promoting unsafe or undesirable properties, which are provably false.

Upon information and belief, these statements were consistent with and mirrored the same inaccurate narratives previously advanced by Defendant, and were publicly engaged with, endorsed, or otherwise amplified within Defendant's sphere of influence. The repetition of these false statements further damaged the marketability of Plaintiff's properties and contributed to public confusion among prospective buyers.

This conduct reflects a pattern of disseminating unverified and misleading information in a manner that contributed to reputational and economic harm to Plaintiff and supports an inference of retaliatory motive. *See Exhibits O-1 through O-15.*

### E. Utility, Fee, Permit, and Construction Interference

42. From April 2024 to date, Defendant and City officials that were his closest allies escalated the pattern of retaliation by interfering with Plaintiff's housing development work through Bogalusa Rebirth, including actions affecting utilities, permit recognition, construction activity, and administrative approvals. These actions occurred in the context of Plaintiff's prior protected speech and form part of the continuing pattern of retaliatory conduct.

43. On April 1, 2024, Defendant emailed Plaintiff stating that "we have found various conflicts with city ordinances" and that "the City will not act" regarding water taps and related project needs. At that time, Plaintiff's projects had been permitted through the proper Parish permitting authority, and Defendant did not provide documentation establishing any actual code violation. Plaintiff alleges that this refusal to act was part of the continuing retaliation following her protected speech. *See attached Exhibit P*

44. Around the same period, the City produced or relied upon a new fee schedule and began to attempt to collect increased fees that Plaintiff contends had not been approved by the City Council. *See Exhibit Q*

45. On or about April 11, 2024, Defendant approved or authorized action related to a request to revoke eight building permits associated with Bogalusa Rebirth projects.

46. The email chain reflecting Defendant's direct approval states, "Approved. Thank you," in response to a request regarding revocation of building permits associated with Rebirth. *See attached Exhibit R*

7

47. Defendant later testified under oath that he "didn't approve or disapprove," which is contradicted by the email reflecting his written approval. *Exhibit R1-2.*

48. On May 7, 2024, City representative Angular Adams, a subordinate hired by the Defendant, arrived at Plaintiff's job site and directed Plaintiff's construction crew to cease work, despite the absence of a valid stop-work order and without providing Plaintiff prior notice or due process.

49. Plaintiff arrived at the job site shortly thereafter, but the City and Parish representatives had already left. Plaintiff then spoke by telephone with Washington Parish Building Official Dewitt Williams, who stated that he informed the City that the project could not be shut down without a valid stop-work order.

Later that same day, a letter was produced and a photograph of the letter was sent to Plaintiff's builder. Plaintiff alleges that this document was created after-the-fact in an attempt to justify the earlier attempt to halt construction. The letter was pre-dated to April 8, 2024, and was never delivered to Plaintiff by mail, certified mail, or email. To date, Plaintiff has never received the letter through any means that would satisfy due process, despite the City's representation that Plaintiff had been properly notified.

Plaintiff further alleges that Christopher Dudzienski, a close personal associate of Defendant who resided in the Mayor's residence and was hired during Defendant's transition period, signed the letter at issue. Mr. Dudzienski and Defendant have a longstanding personal relationship, including attending high school together and engaging in a joint business venture aside from city business. At the time the letter was issued, Mr. Dudzienski was not publicly identified or consistently functioning in the formal capacity of Community Development Director, yet he executed documents using that title. Upon information and belief, Mr. Dudzienski was closely associated with Defendant and acted at Defendant's direction or with his approval. The circumstances surrounding the issuance of the letter, including its timing, lack of proper delivery, and inconsistency with prior communications, support an inference that the action was not taken through ordinary administrative processes, but rather as part of the broader course of conduct described herein. *See Exhibit S.*

50. Later it was revealed by Parish officials that the Washington Parish Department of Building and Permitting had received correspondence from the City requesting that Bogalusa Rebirth legal permits be revoked. *See Exhibit T*

51. On both May 2nd and May 16, 2024, the Washington Parish Department of Building and Permitting denied the request to revoke permits, stating that Bogalusa Rebirth complied with necessary requirements and that required approvals from the City of Bogalusa had been obtained. The Parish further requested that any additional issue be directed to and resolved with Bogalusa Rebirth rather than the Parish permitting office. *See Exhibits U1-2.*

52. Despite the Parish's repeated determinations that Plaintiff had complied with all applicable requirements, Defendant continued to assert under oath that Plaintiff's permits were subject to revocation and that the Parish had acted improperly. Defendant further stated under oath that the Parish "refused to acknowledge their wrongdoing" and suggested that the City could revoke permits unilaterally, despite knowing that such authority rests with the Parish permitting office. Defendant's

8

continued assertions despite contrary documentation further support an inference of intentional and retaliatory conduct.

These statements were made in contradiction to documented findings and demonstrate a continued pattern of mischaracterizing established facts. *See Exhibits U3–U4.*

53. During Defendant's deposition, Mayor Truong admits under oath that the City turned down money for water and sewer hookups. Even though Bogalusa Rebirth had previously received a letter from the City stating "All properties located within the City limits of Bogalusa are entitled to be provided water and sewer tap…." *See Exhibit U5-6*

54. On July 23, 2024, Plaintiff retained counsel to pursue mandamus relief to compel the City to provide water and sewer connections for approved projects.

55. On August 27, 2024, a judgment was entered ordering the City of Bogalusa to provide water and sewer taps for Plaintiff's properties.

56. The Petition for Mandamus Relief and the resulting judgment signed by the Honorable Judge Tara Zeller are attached as *Exhibit V1-11.*

**F. Historic Cultural District Changes and Additional Retaliatory Conduct**

57. In or around September 2024, Plaintiff became aware that Defendant and/or City representatives working closely with him initiated changes to the Bogalusa Historic Cultural District boundaries.

58. Plaintiff had previously been involved in the establishment of the District and the development of the Bogalusa Historic Cultural District map.

59. Plaintiff alleges that the proposed changes affected properties relevant to her development work, including the Long Avenue Elementary School site and other locations she previously identified for redevelopment.

60. Meeting materials and/or transcripts related to the proposed boundary changes reflect a statement by a City representative Christopher Dudkeinski that the district was being "shrunk for bragging purposes." Plaintiff alleges that this statement reflects a lack of legitimate planning justification and supports an inference that the changes were not based on neutral policy considerations. *See Exhibit W.*

61. Plaintiff alleges that the cultural district boundary changes were part of the continuing pattern of conduct that adversely affected her prior work and ongoing development efforts. Plaintiff alleges that these actions were not neutral policy decisions but were part of the ongoing pattern of conduct affecting her work following her protected speech.

62. On September 4, 2024, Plaintiff submitted a written objection to the Office of Cultural Districts raising concerns regarding lack of public notice, absence of publicly advertised meetings, limited community input, and the impact of the proposed changes on historic sites and arts-related activity.

63. The cultural district materials and Plaintiff's objection letter are attached as *Exhibits W1–W3*.

**G. False Statements Used as Retaliatory Conduct**

64. Defendant made public statements and comments regarding Plaintiff and Bogalusa Rebirth, including statements concerning alleged high-interest loans, alleged substandard materials, alleged misuse of funds, and alleged improper conduct. These statements are included not as separate claims, but as evidence of Defendant's motive, intent, and pattern of retaliatory conduct.

65. Plaintiff does not include these facts as a separate defamation claim in this amended complaint, but includes them as evidence of retaliatory motive, intent, pattern, and damages. Defendant made inaccurate statements that "most of the land was donated", when factually none of the land had been donated.

66. In or around September 2025, Defendant publicly stated that others should review Bogalusa Rebirth's audits and the terms of its down-payment assistance programs, alleged that Plaintiff charged excessively high interest rates, and suggested that Plaintiff should be reported or investigated.

67. Defendant also made or repeated statements that Plaintiff's projects used "subpar materials," including statements referencing concrete floors and particle board cabinets.

68. During his March 9, 2026 deposition, Defendant repeated allegations regarding Plaintiff's financing practices but admitted that he did not know the applicable interest rates and had not fully reviewed the documents he referenced.

69. Defendant testified that he had been briefed on audits but had not read them in their entirety.

70. During defendants deposition, he made assertions regarding Plaintiff's financing practices without identifying specific loan terms, rates, or supporting documentation. Defendant testified regarding alleged high-interest financing despite not identifying specific rates, terms, or documents supporting his assertions.

71. Plaintiff possesses loan documentation and program records demonstrating that Bogalusa Rebirth provides low-interest financing, including rates as low as 0.25%, as well as assistance programs designed to reduce or eliminate predatory debt burdens. Additional examples include loans structured at approximately 1.5% interest for the purpose of consolidating and resolving high-interest obligations.

72. Plaintiff also possesses documentation contradicting Defendant's statements regarding the materials used in Bogalusa Rebirth homes.

73. These statements were made without factual support and are included as evidence of retaliatory motive and pattern. The public statements, material specification and relevant deposition excerpts are attached as *Exhibits X1–X8*.

**H. Boycott, Anonymous or Unidentified Accounts, and Need for Third-Party Discovery**

74. On or about February 11, 2025, a boycott was announced from the Bogalusa Resistance Council page naming Bogalusa Rebirth and Plaintiff.

75. Plaintiff alleges that the boycott and related online activity were connected to the same course of retaliatory conduct directed at Plaintiff after her protected speech. Plaintiff further notes that individuals closely aligned with Defendant have publicly posted commentary regarding Plaintiff and this litigation on social media platforms. Defendant has engaged with such posts, including by affirmatively "liking" or otherwise interacting with the content. While such actions may appear indirect, they reflect Defendant's awareness of, and alignment with, public messaging targeting Plaintiff, and further contribute to the ongoing pattern of retaliatory conduct described herein.

76. Plaintiff has identified additional conduct involving anonymous or pseudonymous social media accounts that have engaged in repeated coordinated attacks and dissemination of false or misleading information concerning Plaintiff and Bogalusa Rebirth. These social media accounts that have engaged in a sustained pattern of targeting Plaintiff, Bogalusa Rebirth, and other individuals who have publicly criticized Defendant or his administration by publishing statements containing non-public or highly specific information, coordinated messaging, and repeated false assertions that mirror statements made by Defendant both publicly and under oath. The coordinated nature of these communications, when viewed alongside Defendant's own statements and conduct, supports a reasonable inference of involvement or alignment with the messaging.

In particular, Plaintiff notes that language used by Defendant in sworn deposition testimony, including the phrase "big wigs," appears in substantially similar form in posts and communications attributed to such anonymous accounts. This same phrasing also appears in direct communications from Defendant to Plaintiff. While Plaintiff does not, at this stage, assert definitive authorship of these accounts, the repetition of unique phrasing across sworn testimony, private communications, and anonymous postings supports a reasonable inference of coordination, shared source, or involvement.

Additionally, these anonymous accounts have demonstrated knowledge of internal matters, timing of events, and Plaintiff's activities in a manner that is not consistent with general public awareness, further supporting the need for investigation into the identity of the individuals operating these accounts.

Plaintiff therefore seeks narrowly tailored third-party subpoenas directed to Meta Platforms, Inc. for the limited purpose of identifying the administrators and associated account data for the accounts at issue. This information is directly relevant to Plaintiff's claims of retaliation, coordinated harassment, and misuse of authority, and cannot be obtained through any less intrusive means.

77. Plaintiff has sought third-party subpoenas to identify the individuals responsible for these accounts, including but not limited to accounts associated with suspected alias account Myshia Jones, Bogalusa Resistance Council, The Parish Spectator, Colonial Creosote EPA Superfund: Your Information, fake information page because this information is directly relevant to Plaintiff's claims of retaliation, motive, damages and the scope of coordinated conduct.

78. The social media accounts and boycott-related evidence is attached as Exhibit Y-Y5

### I. Procedural Avoidance, Discovery Noncompliance, and Pending Motions

79. Plaintiff has attempted to formally communicate with Defendant through certified mail regarding this matter.

80. Certified mail addressed to Defendant was returned marked "unclaimed," despite delivery attempts and notice from the United States Postal Service.

81. Plaintiff includes this fact as evidence of notice, avoidance of formal communication as a broader pattern of conduct. This conduct is consistent with Defendant's broader pattern of avoiding accountability and formal processes.

82. The unclaimed certified mail evidence is attached as *Exhibit Z*.

83. Defendant has not fully complied with written discovery obligations despite a Court Order requiring written responses, including responses required by the Federal Rules of Civil Procedure and prior Court orders.

84. Plaintiff previously filed a Motion for Sanctions for Failure to Comply, which remains pending before the Court. Plaintiff also previously sought leave to issue third-party subpoenas; however, the Court has since ruled that such leave is unnecessary under Rule 45. Plaintiff intends to proceed with appropriate third-party discovery consistent with the Federal Rules of Civil Procedure.

85. Plaintiff includes these facts to clarify that discovery remains incomplete and that Defendant's participation in deposition does not reflect full compliance with discovery obligations.

**J. Impact and Damages**

Defendant's conduct affected Plaintiff personally and professionally. Plaintiff seeks damages in an amount to be determined at trial. Plaintiff has suffered damages including loss of access to public information, reputational harm, mental and emotional distress, and interference with her professional work and development activities.

## IV. CAUSES OF ACTION

### COUNT I – FIRST AMENDMENT (VIEWPOINT DISCRIMINATION)

87. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein. Defendant used his Facebook page, titled "Mayor Tyrin Z. Truong," as a public-facing forum to communicate governmental information, including public service announcements affecting health, safety, and city operations.

88. Plaintiff was blocked from this forum after engaging in protected speech critical of Defendant's conduct and actions as Mayor. At all relevant times, Defendant exercised control over access to this page while using it to communicate information in his official capacity as Mayor.

89. Defendant excluded Plaintiff from this public-facing forum based on her viewpoint after she engaged in protected speech critical of Defendant's conduct.

90. Defendant's actions constitute viewpoint discrimination in violation of the First Amendment to the United States Constitution.

**COUNT II – FIRST AMENDMENT RETALIATION**

91. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

92. Plaintiff engaged in protected speech on June 6, 2023 during a City Council meeting addressing matters of public concern, including government transparency and use of public resources.

93. Following this protected speech, Defendant took adverse actions against Plaintiff, including blocking her from a public-facing communication platform, interfering with her development activities, participating in efforts to revoke permits, and making or repeating statements intended to discredit her. These actions were taken in close temporal proximity to Plaintiff's protected speech and constitute adverse actions sufficient to deter a person of ordinary firmness from engaging in such speech.

94. Defendant's conduct would deter a person of ordinary firmness from engaging in protected speech.

95. Defendant's actions were substantially motivated by Plaintiff's protected speech, as evidenced by the timing, escalation, and pattern of conduct described herein.

96. Defendant's conduct violated Plaintiff's rights under the First Amendment to the United States Constitution.

**COUNT III – LOUISIANA CONSTITUTION, ARTICLE I, SECTION 7**

97. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

98. Article I, Section 7 of the Louisiana Constitution protects freedom of expression.

99. Defendant's actions restricted Plaintiff's ability to speak, access public communications, and participate in civic discourse based on her viewpoint and in retaliation for her protected expression.

100. Defendant's conduct violated Plaintiff's rights under Article I, Section 7 of the Louisiana Constitution.

### V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

101. A declaration that Defendant's conduct violated Plaintiff's rights under the First Amendment and Article I, Section 7 of the Louisiana Constitution.

102. Injunctive relief requiring Defendant to unblock Plaintiff from public-facing government communication platforms.

103. Injunctive relief prohibiting Defendant from blocking Plaintiff or other citizens from public-facing government communications based on viewpoint.

104. Compensatory damages for reputational harm, emotional distress, loss of access to public information, and interference with Plaintiff's work and development activities.

105. Costs of court and all other relief the Court deems just and proper to which Plaintiff may be entitled.

106. All other relief that this Court deems just and proper. Plaintiff seeks all relief to which she is entitled under law and equity.

## VI. TRIAL BY COURT

107. Plaintiff does not demand a trial by jury and requests that this matter be adjudicated by the Court.

Respectfully submitted,

Wendy Williams Dupont
305 Ave B, Suite 111
Bogalusa, Louisiana 70427
(985) 516-2005
Plaintiff, Pro Se

14

**EXHIBIT LIST:**

**Exhibit A** – Photographs and Documentation of Plaintiff's Attendance at Mayor's Inauguration and Public Events

**Exhibit B** – Photographs and Documentation of Plaintiff's Participation in Mayoral and Community Events (March–May 2023)

**Exhibit C & D** – Social Media Posts Reflecting Cooperative Relationship Prior to June 2023

**Exhibit E** – Photographs of City Workers performing Work at Mayors Home at 618 Ave B

**Exhibit F1–F7** – Text Messages and Audio Transcript Evidence of May 26, 2023 Meeting with Defendant, and Deposition Contradiction Excerpts

**Exhibit G** – Transcript and/or Record of June 6, 2023 City Council Meeting

**Exhibit H1–H8** – Screenshots of Public Service Announcements from Defendant's Facebook Page

**Exhibit I** – Deposition Excerpts Reflecting Defendant's Admission of Blocking Plaintiff

**Exhibit J** – Documentation Regarding City Facebook Page Limitations or Access Issues

**Exhibit K** – Facebook Post and Evidence Relating to Bicycle Giveaway and Public Promotion on Mayor Tyrin Z. Truong Facebook Page that residents are blocked from

**Exhibit L-L1** – Evidence of Direct Retaliation Post and blocking of Plaintiff just three days after protected speech

**Exhibit M1 and M2** – Photographs and Documentation of Wooded Land Clearing Activity and proof of confidential meeting held in which land was discussed

**Exhibit M3** – City Council Agenda Reflecting Avenue F Dog Park Ordinance

**Exhibit N1** – Public Bid Notice for Long Avenue Elementary School

**Exhibit N2–N3** – Documentation Regarding Post by City of Bogalusa for inviting bids for Long Avenue School Property

**Exhibit O1–O4** – Evidence of Deposition Contradictions and Defendant's willful disregard of established facts. Re-subdivide Evidence, Planning and Zoning Materials and Documentation of Project Compliance

**Exhibit P** – April 1, 2024 Email from Defendant Regarding unsubstantiated Ordinance Conflicts and Utility Refusal

**Exhibit Q** – City Increased Fee Schedule Documentation

**Exhibit R, R1-2** – April 11, 2024 Email Chain "Request to Revoke Permits – Rebirth" with Mayor stating "Approved. Thank you.", and Direct Impeachment, False Denial of permit revocation approval during Deposition.

**Exhibit S** –April 8, 2024 Letter from City of Bogalusa Regarding Permit Revocation – presented on May 7, 2024 after building official informed city of lack of due process and notice

**Exhibit T** – May 2, 2024 Correspondence from City to Washington Parish requesting permit revocation

**Exhibit U1–U6** – Parish Permit Compliance Letters, Deposition Excerpts Regarding Permit Revocation and Parish Authority, City Water Services Letter

**Exhibit V1-11** – Petition for Mandamus and August 27, 2024 Judgment Ordering Utility Connections

**Exhibit W1–W3** – Cultural District Materials stating "shrinking district for bragging purposes" and Plaintiff's September 4, 2024 Objection Letter

**Exhibit X1–X8** – Public Statements and Deposition Excerpts of Contradictions Regarding Loan Interests, Building Materials, and finances

**Exhibit Y1-Y5** – Boycott Post Naming Plaintiff and Bogalusa Rebirth

**Exhibit Z** – Certified Mail Returned "Unclaimed"

16

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing First Amended Complaint has been served upon all parties of record in accordance with the Federal Rules of Civil Procedure on this 29th day of April, 2026.

Via USPS Certified Mail: 9589 0710 5270 3215 7169 54

Wendy Williams Dupont
Plaintiff, Pro Se